IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Action No. 7:22-CR-00018 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| MICHAEL LUIS CONTRERAS, | ) | |
| | ) | By:   Hon. Thomas T. Cullen |
| Defendant. | ) | United States District Judge |

On December 10, 2021, Virginia State Police Trooper Joseph Miller ("Trooper Miller"), who was working with a drug-interdiction unit on Interstate 81 near Roanoke, stopped a 2019 Dodge Ram pickup truck for several traffic infractions, including speeding and an expired registration. Trooper Miller asked the female driver and co-owner of the pickup truck, Monica Alvarado ("Alvarado"), to accompany him back to his police cruiser. Trooper Miller instructed the front-seat passenger (and other co-owner of the vehicle), Defendant Michael Luis Contreras ("Contreras"), to remain in the truck while he spoke to Alvarado.

After running license checks, confirming the vehicle's expired registration, and speaking to Alvarado and Contreras about their recent travel itinerary, Trooper Miller told Alvarado that he suspected the couple was transporting narcotics and that, as a result, they would have to remain on the scene until an officer arrived with a drug-sniffing K9. When the dog arrived, it did not alert to the presence of drugs.

Trooper Miller then told Alvarado that he was going to let her go with a verbal warning, admonishing her to renew the truck's registration as soon as possible. Before Alvarado could get out of Trooper Miller's vehicle, however, the officer asked her if there was anything illegal

in the truck; she said there wasn't. Trooper Miller then asked Alvarado if he could search it; she said he could.

Based on Alvarado's consent, Trooper Miller thoroughly searched the pickup truck. He first inspected the interior cab and its contents, then turned to the bed of the truck. Miller eventually focused on the rear tailgate, remarking to another trooper who had arrived on the scene that it felt heavier than it should. After peering through an opening in the tailgate, the troopers saw what appeared to be objects wrapped in red cellophane, which they suspected contained illegal drugs. Trooper Miller then removed the cover of the tailgate and discovered approximately 17 kilograms of cocaine.

Contreras was arrested and charged in a one-count federal indictment with possession with intent to distribute a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). (*See* Indictment [ECF No. 3].) He filed a motion to suppress the evidence against him. (ECF No. 29.) Contreras's motion was fully briefed, the court received evidence and heard argument on the motion on October 6, 2022. The parties then submitted post-hearing briefs.

Contreras argues that Trooper Miller lacked reasonable and articulable suspicion to prolong the traffic stop for a K9 sniff. The government disputes this, pointing to several factors that, it contends, gave rise to reasonable suspicion. First, the government notes that Trooper Miller testified that he observed a piece of vacuum-sealer packaging material near the backseat of the cab at the beginning of the traffic stop. Trooper Miller explained that this discovery was significant because, in his experience, drug traffickers frequently utilize vacuum-sealed bags to conceal the odor of narcotics from drug-sniffing police K9s. Second, Contreras

and Alvarado gave inconsistent accounts of their recent travel. Third, the truck contained various items—fast-food wrappers, drink bottles, and trash—suggesting non-stop travel. Fourth, the government relies on Trooper Miller's perception that both occupants were unusually nervous throughout the encounter with him.

But the court cannot credit Trooper Miller's testimony that he observed the vacuum-sealer packaging material when he initially pulled the truck over. The officer failed to document this critical observation in the part of his official report explaining what had led to the search. He never confronted Alvarado or Contreras with this apparent discovery at any point while he was questioning them, and Trooper Miller made no mention of the vacuum-sealer packaging material to the other officers on the scene when he provided a detailed account of why he suspected the couple of transporting drugs.

Without the observation of the vacuum-sealer packaging material—which was the only true indicia of drug-trafficking activity—the court is constrained to conclude, under recent Fourth Circuit precedent, that Trooper Miller did not have reasonable suspicion to justify extending the traffic stop. Therefore, the court must grant Contreras's motion to suppress.

## I.   THE FACTS

The traffic stop in question was captured by the dashboard camera in Trooper Miller's police vehicle (the "Video").[1] (*See* ECF No. 38-1.) That video, Trooper Miller's October 6,

---

[1] The Government filed the Video as Exhibit 1 to its opposition. (*See* ECF No. 38-1.) It was also admitted as Government's Hearing Exhibit 1. The Video captures audio and video, and it began recording automatically when Trooper Miller engaged his emergency lights to initiate the vehicle stop, including capturing about one minute prior to his switching on his emergency lights. (Hearing Transcript, Oct. 6, 2022, 10:18–23 [ECF No. 53].) References to the Video are in the "Video mm:ss" format.

2022 hearing testimony,[2] and the parties' respective hearing exhibits comprise the factual record underlying the motion and this Opinion.

On December 10, 2021,[3] Trooper Miller was operating along Interstate 81 in Botetourt County, Virginia, as part of a highway drug interdiction project. (Hearing Transcript, Oct. 6, 2022, 6:24–25 [ECF No. 53] (hereinafter "Hr'g Tr.").) At approximately 9:23 a.m., Trooper Miller clocked a white Dodge Ram pickup going 11 miles per hour over the posted speed limit.[4] (Video 2:45; Hr'g Tr. 11:13–18.) As Trooper Miller followed behind and observed the truck, he performed a rolling plate check on his vehicle's Mobile Data Terminal computer ("MDT"), which revealed that the truck's Maryland registration had been expired for more than a year. (Hr'g Tr. 10:2–5; 18:29–22; Trooper Miller's Report of Investigation ("ROI") (Def's. Hr'g Ex. 1) [ECF No. 49-5].) Trooper Miller also testified that, while following the truck but before engaging his emergency lights to initiate the traffic stop, he observed the truck abruptly change lanes, from left to right, on the two-lane roadway and "drift" in the right lane "as if they were watching [Trooper Miller] behind them." (Hr'g Tr. 10:2–13.) The video confirms that the truck did, in fact, drift to the right within the lane, and at least once its passenger-side tires ran along the solid white line separating the roadway from the shoulder. (*See* Video 00:15–01:00.) Immediately after Trooper Miller activated his emergency lights, the driver pulled onto the right shoulder of the interstate. (Video 2:25–2:40.) Trooper Miller testified that he ultimately stopped the truck for five reasons: speeding (81 miles-per-hour in

---

[2] Trooper Miller was the only witness at the hearing.

[3] Contreras's pre-hearing brief asserts that this incident occurred on December 12, 2021, but the Indictment and the government's pre-hearing brief both say December 10, 2021. Either way, the analysis is identical.

[4] There were also three dogs in the truck.

a 70 mile-per-hour zone); expired registration; "faded" license plate; cracked windshield; and "extremely dark" window tints. (*See* Video 4:22; Hr'g Tr. 7:20–8:6.)

After both vehicles came to a stop on the shoulder of I-81, Trooper Miller approached the truck on its passenger side; the passenger (Contreras) rolled the window down, and Trooper Miller asked the driver (Alvarado) to produce her license and registration and step out of the vehicle. (Video 2:50–3:10.) Trooper Miller stood at the open passenger-side window for nearly a minute while Alvarado searched for the registration, first alone and then with Contreras's help. (Video 2:55–3:45; Hr'g Tr. 17:15–18:1.)

Trooper Miller testified that, while he was standing at the open front passenger-side window, he observed various things he deemed suspicious. He says that he observed the odometer's high mileage reading (over 44,000 miles) on the new-model truck, and that he saw a box in the backseat of the truck with a piece of vacuum-sealer packaging material sticking out of it.[5] (Hr'g Tr. 12:2–10; 14:7–9; 15:2–4 ("vacuum-sealer strip residue kind of stuff"); *see also* Gov't Hr'g Ex. 4 [ECF No. 49-3].) The trooper also noted the presence of at least one energy drink and a bottle of water,[6] some miscellaneous items of fast food or snacks, and trash. (*Id.* 12:11–15; 62:11–17; *see also* Post-Search Front-Seat Photograph (Govt. Ex. 2) [ECF No. 49-1].[7]) According to the trooper, these food and drink items, along with the trash,

---

[5] Trooper Miller testified that he took the piece of vacuum-sealer packaging material as indicative of drug trafficking activity because, in his training and experience, drug traffickers often seal money and kilos of drugs in air-tight bags so a police narcotics K9 will not smell it. (Hr'g Tr. 43:8–19.)

[6] The Post-Search Front Seat Photograph shows what appears to be a one-liter bottle of water and a gallon-size jug of water, and one energy drink. (*See* Govt.'s Hearing Ex. 2.)

[7] These photographs were taken after Trooper Miller had searched the truck and so the positioning of various things as depicted in them is not necessarily the same as it was when Trooper Miller first observed them. (*See* Hr'g Tr. 53:21–24 (regarding Govt.'s Hearing Ex. 4 [ECF No. 49-3]); 54:21–55:4 (regarding Govt.'s Hearing Ex. 3).)

indicated to him that the couple had been trying to stay awake while traveling long distances.[8] (Hr'g Tr. 12:12–15; 28:4–12.) In this regard, Trooper Miller also noted that Contreras and Alvarado both "appeared to be sort of fatigued, like they had been on the road for a while." (*Id.* 28:11–13.)

Trooper Miller testified that both Contreras and Alvarado appeared nervous. (*Id.* 23:11–18.) Specifically, he stated that he observed Contreras's carotid artery pulsing and that Contreras stared straight out the windshield, trying to avoid eye contact with him. (*Id.* 25:23–26:3.) Trooper Miller testified that Alvarado would not make eye a lot of eye contact with him, either. (*Id.* 27:16–20.)

Trooper Miller also testified that he had observed a plastic trash bag with clothes in it on the back seat, but that he did not see any luggage, suitcase, or garment bag—only a small book bag that appeared to contain items for the dogs. (*Id.* 14:10–20; 28:22–29:8 *see also* Post-Search Back-Seat Photograph (Govt. Ex. 3) [ECF No. 49-2].) Trooper Miller also observed a pro-police "Thin Blue Line" sticker on the truck's rear windshield.[9] After about 50 seconds or so, when Alvarado had failed to locate a valid registration, he instructed her to get out of the truck and accompany him to his cruiser. (Video 3:45.)

As he routinely does, Trooper Miller had Alvarado sit in the front seat of his patrol car,

---

[8] In Trooper Miller's training and experience, drug traffickers "tend to make as few stops as possible because they want to get from point A to point B as fast as possible." (Hr'g Tr. 28:7–9.)

[9] This was suspicious to Trooper Miller because drug traffickers can use it as a "disclaimer" to signal to police, "I'm a good guy, I'm not doing anything wrong." (Hr'g Tr. 27:17–28:21.) The court understands Trooper Miller's testimony in this regard to imply that drug traffickers may think such a sticker signals to police that they are or support members of the law enforcement community and are therefore more likely to themselves be law-abiding. They believe such a signal may decrease their chances of being stopped by police or, if they are stopped, serve to blunt suspicions that they are involved in criminal activity. Trooper Miller testified that drug traffickers also use military stickers or religious memorabilia in the same way and for the same purpose. (*Id.* 28:17–21.)

which was parked directly behind the truck. (*Id.*; Hr'g Tr. 18:5–8; 10:11–11:3.) Trooper Miller sat in his patrol vehicle with Alvarado and, when he asked her why the registration had been expired for more than a year, she said she did not know. She said there had been a "problem" that she did not fully understand, and that Contreras might be able to explain it better. (Video 4:35–5:07.) Before answering him, though, she asked Trooper Miller whether they were in Virginia.[10] (*Id.* at 4:42.)

Trooper Miller inquired where the couple was headed, and asked whether they were headed back to Aberdeen, Maryland (since Alvarado's license had an Aberdeen address on it); Alvarado responded "yeah." (Video 5:07; Hr'g Tr. 23:2–8) Because Alvarado had "some hesitation in her voice and body posture" when she answered, Trooper Miller asked her again, and she responded "yes." (Video 5:07–5:17.) Alvarado elaborated that she was not presently residing in Aberdeen, but rather living temporarily in nearby Baltimore while she attended the University of Maryland. (Video 5:17–5:37.) When Trooper Miller asked Alvarado where they were coming from, Alvarado responded, "[W]e were on a road trip with our dogs . . . we stopped at a couple places . . . we went to Nashville . . . we went to . . . uhh . . . what the heck it was . . . I don't know . . . we were just like stopping . . . we're going through something . . . well me personally . . . interesting, very interesting, the lab[rador] got really sick . . . ." (Video 5:48–6:30.) Trooper Miller then asked how long they had been on the road trip and Alvarado responded, "[I]t hasn't been that long." (Video 6:33–37.) Trooper Miller again asked Alvarado how long they had been on the road-trip she described, and she said, "Not long . . . I think

---

[10] Understandably, it struck Trooper Miller as "odd" that Alvarado asked him what state they were in. (Hr'g Tr. 18:10–12.)

since Saturday."[11] (Video 6:47–7:00.)

While Trooper Miller was conversing with Alvarado in his police vehicle, he was simultaneously running her driver's license through law enforcement databases on his MDT, including the National Crime Information Center ("NCIC") and the Virginia Criminal Information Network ("VCIN"). (Hr'g Tr. 18:13–18; 21:25–22:21.) He was also going through the truck's registration information in detail to determine "who the owner of the pickup [was], to see where it [was] registered, see the mileage, see the expiration date, see if it matches the occupants in the vehicle, et cetera." (Id. 18:22–19:3.)

During his MDT database checks, Trooper Miller learned that the truck had been registered in July 2020 with approximately 43 miles on it. (Id. 21:1–14.) Since the truck's odometer displayed over 44,000 miles, this meant that the truck had been driven about 44,000 miles in less than 18 months.[12] (Id. 20:25–21:4.) Trooper Miller further investigated the truck's registration on his MDT and observed that both Alvarado and Contreras were listed as co-owners. (Id. 18:16–19:23; 63:9–11.) Alvarado confirmed to Trooper Miller that the truck was registered in both of their names, Contreras was a co-signer, and that she let him use the truck daily for work. (Id.; 63:9–14; Video 7:32–7:42.)

Trooper Miller testified that, during his conversation and interaction with Alvarado in his police vehicle, he observed her demeanor to be "very nervous." (Hr'g Tr. 23:12.) She was staring straight out of the windshield or looking to the right out of the passenger side window,

---

[11] Based on this exchange, Trooper Miller's impression was that Alvarado was "unsure about where she was traveling back to . . . sort of unsure about where she was going." (Hr'g Tr. 22:25–23:9.)

[12] The high mileage was suspicious to Trooper Miller because, from his experience, it is "not normal for the average citizen" to have driven that "astronomical amount of miles" in such a short period of time. (Hr'g Tr. 51:23–52:3.)

avoiding eye contact with him. (*Id.* 23:12–18.) She was bouncing and constantly rubbing her leg while answering his questions. (*Id.*) This was different than "normal" traffic-stop nervousness because Alvarado's nervousness indicators "never subsided" and, from Trooper Miller's experience, people normally calm down after he engages them in small talk, which he claims he attempted to do by briefly asking her about her schooling. (*Id.* 23:22–24:25.) Trooper Miller conceded, however, that his travel-itinerary questions were not designed to calm Alvarado down, but rather to ferret out whether they had been to a "source location" for drug interdiction purposes. (*Id.* 24:11–24:25.)

When Alvarado confirmed that she "did not know 100% about the situation" with the expired registration (Video 7:45), Trooper Miller left Alvarado in his police vehicle and reapproached the truck to talk to Contreras. (Hr'g Tr. 25:15–19.) Trooper Miller asked Contreras, "[W]here are y'all coming from now?" Contreras answered, "Austin," and added that they had been there for a week visiting family. (*See* Video 8:55–9:09; Hr'g Tr. 26:10–11; ROI at 2.) During this interaction, Contreras still appeared to be "extremely nervous." (Hr'g Tr. 25:24.) His carotid artery was still pulsing, and he was staring out the window, avoiding eye contact with Trooper Miller. (*Id.* 25:24–26:3.) In Trooper Miller's experience, stopped motorists do not normally exhibit this high degree of nervousness. (*Id.* 26:4–9.)

Trooper Miller then returned to his cruiser and asked Alvarado to explain again where they had come from, asking whether Nashville was the only place that they had gone. Alvarado replied, "[W]e went to a couple places . . . we went to Texas, Nashville . . . ." (Video 10:41; ROI at 2.) When Trooper Miller asked where they had gone in Texas, Alvarado replied "I went to, we went to Houston." (Video 10:30–10:53.) Trooper Miller noted it was suspicious

that Alvarado had told him they had been to Nashville and "other places," but that she had never mentioned Texas at all and "kept saying 'um.'" (Hr'g Tr. 26:12–16.) Alvarado also never mentioned visiting family, as Contreras had.[13] (*Id.* 26:18–21.)

Trooper Miller was "very concerned" at that point because of all the things he had observed, the information he had acquired, and because the couple's stories about where they were coming from did not match. (*Id.* 27:4–24.) At this point, another trooper notified Trooper Fridley (who was with his narcotics-certified police K9) over the radio that Trooper Miller needed him "at the 160 northbound," and Trooper Fridley acknowledged the transmission.[14] (Video 10:53–11:33.)

Trooper Miller then asked Alvarado why she had not told him the truth about "going all the way down to Texas," and she responded that she did not think it was important to tell him everywhere they had been on the road trip. (Video 12:20–12:45.) Trooper Miller then informed Alvarado,

> So now, you're gonna be sitting here a little bit longer than what you probably need to be, okay, because a narcotic K9 is going to come and run around the pickup, alright, because you gave a different story than what he gave, so now I believe that you are all involved in some type of criminal activity, mainly probably transporting drugs, okay, so if the dog alerts, we are going to search the vehicle, okay, alright. . . . that's why it's important to be truthful.

---

[13] In Trooper Miller's experience, it is not routine and "sort of an oddity" that two people traveling together do not give the same answers regarding their travel plans or know exactly where they are coming from. (Hr'g Tr. 26:21–27:1.) Also, Houston was known to Trooper Miller to be a "source location" for narcotics and criminal activity. (*Id.* 30:17–21.)

[14] A second unit with a marijuana-certified police K9 previously arrived on the scene, but Trooper Miller sent it away. A recent change in Virginia law effectively decriminalized small amounts of marijuana, so an alert for marijuana would have been of little use to Trooper Miller. (*See* Hr'g Tr. 29:19–30:6.)

(Video 12:57–13:30.) When Trooper Miller told Alvarado that he thought she was transporting drugs, she "basically just didn't give any reaction to that statement at all" and just kept staring out the windshield without making eye contact with him. (Hr'g Tr. 32:18–33:2.) Trooper Miller testified that, at that point in time, he was "honed in on the criminal element" investigation and believed that he had "gotten to the point beyond reasonable suspicion" that criminal activity involving drugs was afoot. (*Id.* 33:3–17.) He conceded that—based on the totality of the circumstances that had in his mind creating suspicion of drug trafficking—he extended the traffic stop to investigate the criminal activity he was suspicious of. (*Id.* 50:3–18.)

About 90 seconds after Trooper Miller told Alvarado that he was calling the K9 unit to sniff the truck, Trooper Fridley arrived on scene with his narcotics K9. (Video 14:30.) While the K9 was working, Trooper Miller continued to talk with Alvarado. He asked her why they had gone to Houston, but her answer is largely inaudible. (Video 16:12–16:22.) When the K9 did not "hit" on the truck, Trooper Fridley put the dog back in his squad car. (Video 17:45.) Trooper Fridley notified Trooper Miller of the negative dog sniff result via MDT message. (Hr'g Tr. 36:12–37:3.)[15]

With Alvarado still in the passenger seat next to him, Trooper Miller said, "I'm going to return your license back to you, okay, so obviously y'all have a lot of things going on with

---

[15] Trooper Miller recorded in his Contact Report Form B that, "[w]hen Trooper Fridely ran k-9 on exterior of veh[icle], driver was honking horn and dogs inside barking distracting [F]ridely and k-9." (Gov't Hr'g Ex. 5 [ECF No. 49-4].) Similarly, he recorded in his RIO that "Trooper Fridley advised that while utilizing his canine the passenger began honking the horn on the pickup and that the three canines inside of the pickup were all distracting his canine. Trooper Fridley advised that he was not calling an alert after utilizing his canine, and that he was not able to perform a search or air free sniff due to the distractions of the passenger and canines inside the pickup." (Def.'s Hr'g Ex. 1 [ECF No. 49-5].) Although Trooper Fridley relays something about a horn to Miller on the Video (*see* Video 21:11), this necessarily came nearly 10 minutes *after* Trooper Miller had decided to extend the stop. Accordingly, it could not have factored into Trooper Miller's decision to extend the stop. Likely recognizing this fact, the government made no mention of Contreras's suspicious behavior at the hearing or in their briefing.

the truck and with his license and everything." (Video 19:47.) Trooper Miller issued Alvarado verbal warnings for the traffic offenses and returned her license to her. (Hr'g Tr. 37:21–38:4.) Trooper Miller then said, "Before you go, is there anything illegal in the truck?" Alvarado responded, "Not that I'm aware of, if I'm being completely honest." Trooper Miller asked, "Does he [Contreras] have anything illegal?" Alvarado responded, "No." Trooper Miller asked, "Can I search the truck before you go?" and Alvarado replied, "Yeah." (Video 20:39.) Trooper Miller testified that, at the time he asked for consent, he still had suspicion of illicit drug activity because he has had negative dog sniffs before but nevertheless asked for consent to search and "pull[ed] out kilos" from vehicles. (Hr'g Tr. 38:6–14.)

Trooper Miller got out of his cruiser, approached the truck, and told Contreras that Alvarado had given her consent to search the truck. (Video 22:25.) Contreras's response, if any, is inaudible in the Video. Trooper Miller testified that Contreras did not contest Alvarado's consent or the search. (Hr'g Tr. 39:10–12.)

Once Contreras and the dogs exited the truck, Trooper Miller and the other troopers on the scene began the search, starting with its cab. To access the bed of the truck, Trooper Miller pulled down the tailgate. (Video 33:15.) After searching the bed, Trooper Miller got down, put the tailgate up, and lowered it back down again. He testified that he kept shaking it because it was "extremely heavy, more than what a normal tailgate would weigh." (Hr'g Tr. 40:9–12.) He also noticed that the tailgate's bolts had "tooling"[16] on them, indicating to him that they had recently been removed. (*Id.* 41:10–23.) In Trooper Miller's mind, this was significant because he had also discovered a brand-new socket wrench in the back seat of the

---

[16] "Tooling" means marks made by a tool. (Hr'g Tr. 41:18–22.)

truck that matched the size of the "tooled" bolts. (*Id.* 41:15–18.)

Trooper Miller inspected the tailgate from different angles, shining his flashlight on it and even getting on the ground to examine it from underneath. Eventually, he waved another trooper over and they looked at the tailgate together. The other trooper moved the tailgate up and down and said, "I think it's loaded." (Video 35:50–36:10.) The troopers were able to see inside the tailgate, and they saw packages that appeared to be wrapped in red and black tape and in the same type of vacuum-sealer packaging material that Trooper Miller testified he had seen in the back seat. (Hr'g Tr. 42:3–11; 53:4–6.) From Trooper Miller's training and experience, this taping and packaging was consistent with illicit drugs. (*Id.* 42:22–23.) Trooper Miller then removed the tailgate's cover and discovered 17 kilograms of packaged cocaine. (Video 37:28–41:25.) Contreras was arrested on the scene and later charged by federal prosecutors. Alvarado was not charged federally.

Contreras then filed the present motion to suppress. When Contreras brought new counsel into the case, the court instructed counsel to notify the court whether he intended to "adopt, amend, or withdraw [Contreras's] previously filed motion to suppress" (ECF No. 36), which he adopted (ECF No. 37). The court set the motion for a hearing on September 19, 2022. At the scheduled hearing, the parties jointly requested a continuance to give the defense time to review Trooper Miller's investigative checklist and narrative, which the government had only provided a day or so before the scheduled hearing. The court granted the request and reset the hearing for October 6.

## II.   LEGAL STANDARD

"In deciding a motion to suppress, the district court is empowered to make findings of fact, and conclusions of law." *United States v. Adkinson*, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005)). "At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993). A defendant has the burden of proof on his motion to suppress but, once he establishes a basis for his motion, the burden shifts to the government to justify its actions. *See United States v. Matlock*, 415 U.S. 164, 177–78 n.14 (1974); *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). "The government bears the burden of demonstrating that a warrantless seizure is reasonable." *United States v. Watson*, 703 F.3d 684, 689 (4th Cir. 2013).

## III.   ANALYSIS

"[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. Amend. IV. "A traffic stop constitutes a seizure under the Fourth Amendment and is thus subject to a reasonableness requirement." *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (cleaned up) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)); *see also United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018). "[A]n officer may initiate a traffic stop on the basis of reasonable suspicion that criminal activity is afoot, even in the absence of probable cause. Such investigatory stops must be supported with 'articulable facts indicative of criminal misconduct.'" *United States v. Womack*, 546 F. Supp. 3d 494, 498 (4th Cir. 2001) (quoting *Illinois*

- 14 -

*v. Wardlow*, 528 U.S. 119, 123–24 (2000)). The reasonableness of a traffic stop "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

A traffic stop that is legitimate at its inception is reasonable in its totality if "the officer's actions during the stop are reasonably related in scope to the basis for the stop." *United States v. Perez*, 30 F.4th 369, 375 (4th Cir. 2022) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "An officer may engage in 'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). A police officer may order a driver out of a vehicle and conduct limited unrelated investigations by questioning the driver or passengers without violating the Fourth Amendment. *See Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *Rodriguez*, 575 U.S. 348.

"While the Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention, the seizure remains lawful only so long as [unrelated] inquiries do not measurably extend the duration of the stop." *Perez*, 30 F.4th at 375 (citing *Rodriguez*, 575 U.S. at 354–55) (cleaned up). "[A] legitimate traffic stop may 'become unlawful if it is prolonged beyond the time reasonably required' to complete its initial objectives." *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "To prolong a traffic stop 'beyond the scope of a routine traffic stop,' an officer 'must possess a justification for doing so other than the initial traffic violation.'" *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011) (quoting *United States v. Branch*, 537 F.3d 328, 336 (4th Cir.

- 15 -

2008)). Indeed, "once the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver 'must be allowed to proceed on his way.'" *Branch*, 537 F.3d at 336 (quoting *United States v. Rusher,* 966 F.2d 868, 876 (4th Cir. 1992)).

An officer "may engage a K9 unit to conduct a 'dog sniff' around a vehicle during a lawful traffic stop in an attempt to identify potential narcotics." *Hill*, 852 F.3d at 382 (citing *Caballes*, 543 U.S. at 407–09). A dog sniff is not a Fourth Amendment search and does not require probable cause, and a positive indication from a trained K9 provides probable cause to search the automobile for illicit substances. *Caballes*, 543 U.S. at 409. But unless there is some other justification for extending a traffic stop, a dog sniff "may not prolong the duration of the traffic stop absent consent of those detained or reasonable suspicion of criminal activity." *Hill*, 852 F.3d at 382 (citing *Rodriguez*, 575 U.S. at 355–57). "The 'critical question' is not whether the dog sniff 'occur[red] before or after the officer issue[d] a ticket,' but whether the 'tasks tied to the traffic infraction [we]re—or reasonably should have been—completed.'" *Perez*, 30 F.4th at 375 (citing *Rodriguez*, 575 U.S. at 354, 357).

If, during an investigation for traffic infractions, an officer develops reasonable, articulable suspicion of criminal activity, he is authorized to detain the subject or subjects of that investigation long enough to confirm or dispel that suspicion. *See Branch*, 537 F.3d at 332 & 338–40 (holding that the court need not determine whether a 30-minute detention for a routine traffic stop was justified where reasonable articulable suspicion of narcotics activity arose during it, providing additional justification for detaining the suspect); *see also Williams*, 808 F.3d at 245 (quoting *Wardlow*, 528 U.S. at 123). Even with reasonable suspicion to justify

extending a traffic stop, an officer "cannot search the stopped vehicle unless he obtains consent, secures a warrant, or develops probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016) (citing *United States v. Baker,* 719 F.3d 313, 319 (4th Cir. 2013)). "The government bears the burden of demonstrating that a warrantless seizure is reasonable." *Watson*, 703 F.3d at 689.

## A. The Vehicle Stop

Contreras concedes that the initial vehicle stop was lawful because, at a minimum, Trooper Miller's radar indicated that the truck was traveling 81 miles-per-hour in a 70-mile-per-hour zone. (Hr'g Tr. 64:22–65:10; Def.'s Post-Hr'g Br. at 1 [ECF No. 50].) Indeed, Trooper Miller stopped the truck for five reasons, each of which gave him probable cause— or at least reasonable suspicion—that a violation of Virginia's traffic laws had occurred: (1) speeding, Va. Code Ann. § 46.2-870; (2) expired registration, *see id.* § 46.2-613; (3) "faded" license plate, *see id.* § 46.2-607; (4) cracked windshield, *see id.* § 46.2-1003; and (5) "extremely dark" window tints, *see id.* § 46.2-1052(B). (*See* Video 4:22; Hr'g Tr. 7:20–8:6.). The court has no trouble concluding that the vehicle stop was lawful.[17]

## B. The Traffic Infractions Investigation

Contreras also concedes that the scope and length of Trooper Miller's investigation of these suspected traffic violations was appropriate. After stopping the truck, Trooper Miller continued diligently pursuing his traffic infractions investigation. Indeed, he immediately exited his cruiser and approached the truck to gather Alvarado's license and ask for the truck's

---

[17] Even if Trooper Miller's intent in stopping the truck was to investigate narcotics trafficking, pretextual stops do not violate the Fourth Amendment so long as the officer had an objectively valid justification for the stop. *See Wren*, 517 U.S. at 813; *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) ("[W]e do not attempt to discern an officer's subjective intent for stopping the vehicle.").

registration.

It was permissible for Trooper Miller to direct Alvarado to exit the truck and sit in the front seat of his police cruiser while he ran her license and the truck's registration through NCIC and VCIN and attempted to perform other law enforcement database checks. *See Mimms*, 434 U.S. at 111. Trooper Miller's "where-are-you-coming-from" and "where-are-you-going" conversation with Alvarado was routine and, even if aimed at eliciting information creating suspicion of criminal activity, did not delay his simultaneous investigation into her driver license's validity, the truck's registration, or any of the other reasons for the stop.

Trooper Miller also acted within his lawful authority in reapproaching the truck to talk to Contreras about the expired registration. Alvarado could not clearly explain to Trooper Miller why the truck's Maryland registration was expired for over a year. She also told him that the truck was registered in both of their names, that Contreras was a co-signer, that Contreras used the truck daily, and that Contreras would know more about the registration. Trooper Miller was justified in talking to Contreras, and that conversation was brief and executed without delay.

Trooper Miller's traffic infraction investigation was not in any way prolonged to investigate suspicion of criminal activity unrelated to the traffic stop *until* the point in time when Trooper Miller told Alvarado that it was:

> *[N]ow you're gonna be sitting here a little bit longer than what you probably need to be*, okay, because a narcotic K9 is going to come and run around the pickup, alright . . .

(Video 12:57–13:30 (emphasis added).) And Trooper Miller explained to Alvarado *why* he was prolonging the traffic stop for this purpose:

> . . . *because* you gave a different story than what he gave, so now I
> believe that you are all involved in some type of criminal activity,
> mainly probably transporting drugs, okay, so if the dog alerts, we
> are going to search the vehicle, okay, alright. . . . that's why it's
> important to be truthful.

(*Id.* (emphasis added).) At the hearing, Trooper Miller acknowledged that, in his mind, the

traffic investigation had concluded by that point, and he prolonged the stop based on his

suspicion of drug trafficking. (Hr'g Tr.33:3–16.)

Because the traffic stop was prolonged to investigate suspected drug trafficking, the

court must decide whether Trooper Miller then had an objectively reasonable, articulable

suspicion justifying the prolonged seizure. *See United States v. Digiovanni*, 650 F.3d 498, 407 (4th

Cir. 2011); *Branch*, 537 F.3d at 336.

## C.  Suspicion Prolonging the Stop to Investigate Criminal Activity

The reasonable suspicion standard is less than what is required for probable cause,

*Wardlow*, 528 U.S. at 123, and "considerably less than" what is required to find a preponderance

of the evidence. *Branch*, 537 F.3d at 336 (quoting *Wardlow*, 528 U.S. at 123). But it is "more

than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Wardlow*, 528

U.S. at 123 (quoting *Terry*, 392 U.S. at 27). "Reasonable suspicion is a 'commonsense,

nontechnical' standard that relies on the judgment of experienced law enforcement officers,

'not legal technicians.'" *Williams*, 808 F.3d at 246 (citing *Ornelas v. United States,* 517 U.S. 690,

695 (1996) (cleaned up)). "To support a finding of reasonable suspicion, we require the

detaining officer 'to either articulate why a particular behavior is suspicious or logically

demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative

of some more sinister activity than may appear at first glance.'" *Id.* (citing *United States v.*

*Foster,* 634 F.3d 243, 248 (4th Cir. 2011)). "Under the applicable principles, the relevant facts articulated by the officers and found by the trial court, after an appropriate hearing, must 'in their totality serve to eliminate a substantial portion of innocent travelers.'" *Id.* (citing *United States v. McCoy,* 513 F.3d 405, 413 (4th Cir. 2008)). But "each articulated fact need not '*on its own* eliminate every innocent traveler.'" *Id.* (quoting *United States v. McCoy,* 513 F.3d 405, 413 (4th Cir. 2008)). "[R]easonable suspicion is based on the totality of the circumstances, and may well 'exist even if each fact standing alone is susceptible to an innocent explanation.'" *United States v. Palmer*, 820 F.3d 640, 652 (4th Cir. 2016) (quoting *McCoy,* 513 F.3d at 413–14 (footnote omitted)). The court must account for the reasonable inferences a police officer is entitled to draw from the facts in light of his training and experience. *See Terry*, 392 U.S. at 27. "[I]f sufficient objective evidence exists to demonstrate reasonable suspicion, a *Terry* stop is justified regardless of a police officer's subjective intent." *Branch*, 537 F.3d at 337.

Trooper Miller testified that, at the point he expressed that he was prolonging the stop because he suspected Alvarado and Contreras were transporting drugs, he was "honed in on the criminal element" investigation and he believed that he had "gotten to the point beyond reasonable suspicion" that they were transporting drugs. (*Id.* 33:3–17.) Trooper Miller's suspicion was not based on any one thing he had observed or learned in his investigation to this point, but rather based on a totality of the circumstances. (*Id.*)

In its supplemental brief filed after the hearing, the government clarified its position that seven factors, taken together, gave rise to reasonable suspicion that criminal activity—specifically drug trafficking—was afoot: (1) the presence of the vacuum-sealer packaging material; (2) Contreras's and Alvarado's nervousness; (3) items in the truck indicating that they

had traveled a long distance without breaks; (4) Contreras's and Alvarado's perceived suspicious and inconsistent accounts of recent travel; (5) the high mileage on the truck's odometer; (6) the fact that the couple had traveled to Houston, a "source location" for illegal drugs; and (7) the presence of a "Thin Blue Line" decal on the rear window.

### 1.   The Vacuum-Sealer Packaging Material

At the hearing on Contreras's motion to suppress, Trooper Miller seized upon the vacuum-sealer packaging material as indicative of drug trafficking activity because, in his training and experience, drug traffickers often seal money and drugs in air-tight bags so a police narcotics K9s will not smell it. (*See* Hr'g Tr. 43:9–21.) He is, of course, correct, and the presence of this type of drug-trafficking paraphernalia, in combination with the other factors listed above, would almost certainly give rise to reasonable suspicion. But the court is not persuaded that Trooper Miller saw this crucial piece of evidence prior to informing Alvarado that he was prolonging the stop to investigate drug-trafficking activity. Indeed, a careful examination of his contemporaneous checklist and report leads to the more likely conclusion that the officer did not discover the vacuum-sealer packaging material until the later search of the vehicle. In other words, the court finds that the officer was not aware of this drug paraphernalia prior to prolonging the stop, and it did not factor into his reasonable-suspicion calculus.

While he was waiting for Trooper Fridley and his K9 to arrive, Trooper Miller testified that, in addition to searching additional law enforcement databases, he was also filling out the Virginia State Police Contact Report Form B.[18] (Gov't Hr'g Ex. 5 [ECF No. 49-4]; Hr'g Tr.

---

[18] This form is required any time a Virginia State Trooper performs a vehicle stop. (Hr'g Tr. 33:20–34:12.)

33:20–34:12.) Among other things, this report contains an area to insert the driver's demographic information, the vehicle's registration information, the reason for the stop, check-box options where a trooper can indicate what positive indicators or suspicious behavior justified an investigative detention or search of the vehicle or its passengers, and a narrative section for additional notes and information. (*See id*.; Contact Report Form B.)

| INDICATORS | | | |
|---|---|---|---|
| ☐ Abnormal Sweating | ☐ Currency | ☐ Hand Written Directions | ☐ Owner Not Present |
| ☐ Air Fresheners (Multiple) | ☐ Deliberate Speech | ☐ Heavy / Holding Breath | ☐ Pulsating Artery |
| ☐ Anomalies (Explain) | ☐ Difficulty Swallowing | ☐ Hesitation (Itinerary, Etc.) | ☒ Quick Turn Around in Travel |
| ☐ Anxiety | ☐ Disassociate from Vehicle | ☐ High Mileage | ☐ Rental Vehicle |
| ☐ Arm/Hand Gestures | ☒ Disclaimers (FOP, Etc.) | ☐ Implausible Itinerary | ☐ Rigid/Frozen |
| ☐ Attire (Inappropriate) | ☒ Evasiveness | ☐ Single Key | ☐ Skips Around Abruptly |
| ☐ Audible/Deep Sighs | ☒ Excessive Nervousness | ☒ Luggage (Disproportionate) | ☒ Source City/State |
| ☒ Avoidance | ☐ Eye Contact | ☐ Map/GPS | ☐ Uses Qualifiers |
| ☐ Bite/Chew/Lick Lips | ☐ Facial Expressions | ☒ Multiple Cell Phones | ☐ Voice Inflection/Tone |
| ☒ Body Posture (Explain) | ☐ Fake Smile/Laughter | ☐ New Paint | ☐ Weapons |
| ☐ Chain Smoking | ☒ Fast Food/Snacks Excessive | ☐ Obvious Shaking | ☐ Yawns Continuously |
| ☒ Conflicting Stories | ☒ Fatigued | ☒ Older Car Recently Registered | ☐ BLOC/CCH/EPIC/NADDIS |
| ☒ Cost Effective | ☐ Feigned Memory Loss | ☒ Overtly Cooperative | ☐ Other (Note in Narrative) |

(Contact Report Form B; *see also* ROI; Hr'g Tr. 49:10–12.) Notably, Trooper Miller did not check the available boxes for "high mileage," "eye contact," or "pulsating artery," despite testifying at the hearing that both were indicators on the scene. And curiously, "paraphernalia"—like the vacuum-sealer packaging material Trooper Miller testified he observed in the truck—is not listed as a potential indicator; nevertheless, Trooper Miller did not check the box for "Other (Note in Narrative)."

At some point later, Trooper Miller also filled out the narrative section of the Contact Report Form B. Notably, he did not list the vacuum-sealer packaging material in the "Clarifying Information/Notes/Justification for Brief Investigative Detention/Probable Cause for Search" section's top paragraph, which is typed in all capital letters. (*See* Contact Report Form B.) Instead, he listed it only in the second, lower paragraph, after the word

"search" that was typed in all lower-case letters. (*Id.*)[19] Although Trooper Miller testified that

Form B provides only a small box to type in and there is limited space for information (Hr'g

Tr. 60:1–15), he listed numerous other factors there (in all capital letters, over about four full

lines of text), but he did not list what is undoubtedly *the* most objectively suspicious indicator

of drug trafficking.

NARRATIVE (MANDATORY)
Clarifying Information/Notes/Justification for Brief Investigative Detention/Probable Cause for Search: CONFLICTING STATEMENTS, DRIVER ADVISED NASHVILLE, TN VAUGE ABOUT TRIP INITIALLY, PASS ADVISED AUSTIN TX VISITING FAMILY.. FEMALE DRIVER CONFRONTED ABOUT TRAVEL, ADVSIED WENT TO HOUSON, TX, NO REASON FOR TRIP.. FEMALE INITALLY ADVSEID THEY OR SHE WAS GOING THROUHG SOME THINGS. REG EXPIRED OVER A YEAR AGO, MALE STATED BECAUSE OF PREVIOUS VIOLATIONS IN MD. BUT HAD BEEN WORKING TO CORRECT THE SITUATION BUT DMV IN MD HAD NOT RESPONDED TO HIM.
Search new socket and hex bit under back seat with black duct tape, back seat in modelo box had vacum sealed packaing material, and black duct tape pieces. instructions to tailgate under back seat. truck bed had dried up katchup.  Could see red cellophane wrappin when looked through the tailgate. Tailgate extra heavy when initially let down, and tooling on bolts, which also matched the tool found under the back seat. When Trooper Fridely ran k-9 on exterrior of veh, driver was honking horn and dogs inside barking distracting fridely and k-9.

Type of Hit:  K-9 UTUILIZED NO  ALERT/ OBTAINED CONSENT TO SEARCH FROM FEMALE DRIVER AND OWNER OF PICKUP

(*Id.*)

Strikingly, Trooper Miller also never mentioned packaging material to his colleagues

on the scene when he explained, in some detail, why he had suspected Contreras and Alvarado

of drug trafficking. Instead, he mentioned, more than once, that differences in their respective

itineraries had made him suspicious. (*See* Video 21:00–22:04 ("She gave me consent . . . their

stories are all jacked up. She first told me that they went down to Nashville . . . he's like 'we

went to Austin' . . . she said 'we went to Houston, Texas. . . .'"); Video 43:00–44:10 ("I said

where are y'all coming from, and she's like 'Nashville' . . . . [Inaudible] . . . he's like 'we went

---

[19] On cross-examination, Trooper Miller explained that this is a small box to type in and there is limited space for information so he cannot put everything that he sees in there, but that, despite its absence there, he saw the vacuum-sealer packaging material as part of his initial observations through the front passenger-side window. (Hr'g Tr. 60:2–13.)

The court notes that this same lower-case-letters "[s]earch" section of the Contact Report Form B also indicates "new socket and hex bit under back seat," and these items are things that Trooper Miller did not discover until he executed the later consent search of the truck. (*See* Hr'g Tr. 59:14–60:1.)

down to Austin, Texas. . . .' I asked her, 'why didn't you tell me about going to Texas . . . .' She said, '. . . we went to Houston.'").) Similarly, Trooper Miller never mentioned this apparent discovery of drug paraphernalia to Alvarado or Contreras, let alone confront them with it, even though he continually pressed them about discrepancies in their accounts of recent travel.

And in his more detailed Report of Investigation narrative, Trooper Miller only mentioned the vacuum-sealer packaging material in the context of the *subsequent* search of the automobile: "I began searching the vehicle where I later observed . . . [a] Modelo beer box . . . located in the rear floor board [*sic*] . . . behind the driver seat that contained scrap pieces of black duct tape, and vacuum sealed packaging." (ROI.) Unlike on the Form B, there is no limit to what Trooper Miller could have written in his ROI narrative. (Hr'g Tr. 60:14–16.) Based on Trooper Miller's description of where the vacuum-sealer packaging material was located and the other items with which it was located, the court finds it implausible that he noticed it initially while he was looking through the open passenger side window.

Given the dearth of contemporaneous evidence supporting Trooper Miller's assertion that he saw the vacuum-sealer packaging material at the beginning of the traffic stop, the court simply cannot credit his testimony on this point. Rather, the evidence strongly suggests that the packaging material was identified—for the first time—during the later search, and Trooper Miller's recollection of this vital evidence is mistaken. Accordingly, the court will not consider the presence of vacuum-sealer packaging material in assessing whether the officer had reasonable suspicion to justify prolonging the stop.

### 2. The Remaining Factors are Insufficient under *Bowman*

Many—but not all—of the remaining reasonable suspicion factors bear a close

resemblance to those presented, but ultimately rejected, in *United States v. Bowman*, 884 F.3d 200 (4th Cir. 2018). In *Bowman*, a traffic stop justified by "speeding and unsafe movement of the vehicle" was prolonged for a police K9 to arrive, which ultimately resulted in police discovering methamphetamine in the vehicle and the defendant being charged with it. *Id.* at 205–06. The arresting officer in that case ordered Bowman—the vehicle's operator—out of the car and into the front passenger seat of his police cruiser at the outset of the stop. As in this case, the officer separately questioned Bowman and his passenger. The officer in *Bowman* testified about four factors or sets of factors that created his suspicion that criminal activity was afoot: (1) the driver's nervousness; (2) the presence of clothes, food, and an energy drink in the vehicle; (3) Bowman's uncertainty about the address of the passenger's girlfriend, which is where he claimed he was coming from; and (4) and inconsistencies between Bowman and his passenger about their recent travels Ultimately, the Fourth Circuit held that these factors did not give rise to reasonable suspicion for prolonging the stop. The same is true here.

   i. <u>Nervousness</u>

   In *Bowman*, like in this case, both the driver and passenger stared straight ahead and avoided eye contact, and both of their carotid arteries were "beating very hard and rapidly." *Id.* at 205–06, 214–16. Bowman's hands trembled when he handed the officer his license, and one of the occupants looked back toward the officer. *Id.* at 205–06. Bowman was unable to remain still while seated in the police cruiser, indicating his nervousness. *Id.* at 215–16. Bowman's nervousness subsided as time went on while he sat in the cruiser. *Id.* at 214–16. Similarly here, the truck's drifting in the right lane "as if they were watching [Trooper Miller] behind them," Contreras's and Alvarado's staring straight ahead and avoiding eye contact with

Trooper Miller, Contreras's carotid artery pulsing, and Alvarado's leg tapping and rubbing while in his squad car, are all paradigmatic of nervousness. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124.

While the duration and type of nervousness exhibited here is arguably more pronounced than it was in *Bowman*—because it never subsided and because Trooper Miller testified that, in his experience, that was not normal—the government did not present any explanation as to *how* the nervousness exhibited here is beyond the norm. *See Bowman*, 884 F.3d at 215 (citing *United States v. Massenburg*, 654 F.3d 480, 490 (4th Cir. 2011)); *see also United States v. Digiovanni*, 650 F.3d 498 (4th Cir. 2011) (holding that reasonable suspicion was lacking where, among other things, initial hand trembling but calm and cooperative disposition thereafter justified district court's discounting nervousness as a factor). *Cf. United States v. Mason*, 628 F.3d 123, 129 (4th Cir. 2010) (relying on police officer's testimony that an innocent individual's initial nervousness usually subsides; reasonable suspicion found where the police officer testified that defendant's sweating and nervousness "became more pronounced as the stop continued"). Here, as in *Bowman* and *DiGiovanni*, the video does not reveal Alvarado's level of nervousness to be greater than can be expected of a young person in otherwise similar circumstances, and her nervousness does not appear to increase (as the driver's did in *Mason*). And the avoidance of eye contact or staring straight ahead is also not persuasive in and of itself since it can be "just as likely to be a show of respect and an attempt to avoid confrontation," and in other cases the government has argued "just the reverse: that it is suspicious when an individual looks or stares back at officers." *Massenburg*, 654 F.3d at 489.

Finally, the truck's drifting in the lane "as if they were watching [Trooper Miller] behind

them" is unpersuasive. This kind of nervous driving is just as often exhibited by largely innocent motorists fearful of being pulled over by the police, as it is by suspected drug runners.

As in *Bowman*, the nervousness indicators alone—however many of them there are—are not sufficient to find objective reasonable suspicion of criminal activity.

> ii.    Indicators of Long-Distance Travel Without Stopping

Similar to this case, the officer in *Bowman* testified that the "energy drink in the front seat console, food and food wrappers in the front seat, and a suitcase and loose items of clothing in the back seat" suggested the occupants "could have been possibly traveling for a . . . long period of time, and in a hurry to get from one location to another [without] taking time to stop and rest or have meals." 884 F.3d at 205–06. The government makes the same argument here, even going a step further by arguing that the "breakneck pace" of the trip was consistent with a "turnaround trip" frequently employed by narcotics traffickers. (Gov.'s Post-Hr'g Br. at 11 [ECF No. 57].)

In support of its "turnaround trip" argument, the government cites *United States v. Mason*, 628 F.3d at 129. But in that case, this factor was one of many that gave rise to reasonable suspicion. In *Mason*, the vehicle took "a while to pull over" while the trooper observed Mason having a conversation with his passenger (indicative of conferring about whether to pull over or flee). Importantly, the trooper also testified that: (1) an "extreme odor of air freshener [was] coming from the window" (which the officer explained was commonly used to mask the smell of narcotics) (citing *Branch*, 537 F.3d at 338)); (2) there was only one key on the key ring; (3) "no luggage" was inside the vehicle; (4) a newspaper from that same day with an Atlanta hotel label on it was located in the car, indicating they had traveled to and from Atlanta—"a known

source city for drugs" and "ranked third in the nation in terms of drug distribution"; (5) the interstate was a common route for drug traffickers; (6) the driver and passenger exhibited signs of nervousness that "became more pronounced as the stop continued"; and (7) they provided completely different stories about where and why they had traveled. *Id.* at 126–29.

The facts of this case are distinguishable. Alvarado pulled the truck over promptly. The occupants of the car were also traveling with clothing, albeit in a white plastic bag rather than formal luggage. There was also no testimony from Trooper Miller about Interstate 81 being a known route for drug traffickers[20] and, as explained below, Contreras's and Alvarado's travel stories were not entirely inconsistent. Regarding the government's supplemental argument that this was indicative of a "turnaround trip," Contreras told Trooper Miller that the couple had been in Austin visiting family, and that they had been there for a week (*see* ROI at 2; Video 8:58–9:09). There is no indication that Trooper Miller factored the drive time and distance into his determination that their travel stories were inconsistent.

At bottom, reasonable suspicion cannot hinge on the "turnaround trip" theory the government posits in its post-hearing brief. While the court recognizes that Contreras's and Alvarado's stories are questionable (given the length of a trip from Aberdeen, Maryland, to Austin or Houston, Texas), there is no evidence that Trooper Miller was aware of the distance

---

[20] Even if there were, the Fourth Circuit "has stated that traveling on a known drug corridor is not itself probative of criminal behavior and does not serve to eliminate a substantial portion of innocent travelers." *United States v. Miller*, No. 21-4086, 2022 WL 17259018, at *9 (4th Cir. Nov. 29, 2022) (citing *Williams*, 808 F.3d at 247 (explaining that "the number of persons using the interstate highways as drug corridors pales in comparison to the number of innocent travelers on those roads," and stating that "we are not persuaded by the proposition that traveling [on a known drug corridor] . . . helps narrow the identification of travelers to those involved in drug activity.")).

from one location to the other or how long a trip would necessarily take such that it was apparent to him that their stories were improbable.[21]

Although Trooper Miller checked the "Quick Turnaround in Travel" box on his Contact Report Form B, the court is not persuaded by this tick mark for two reasons. First, not all the boxes on Form B were properly checked. For example, the "older car recently registered" box was erroneously checked. Second, Trooper Miller did not check all the boxes that he arguably could have.

Although the government's eleventh-hour turnaround-trip argument is ultimately unpersuasive, Trooper Miller believed that what he observed inside the cab of the truck indicated that Alvarado and Contreras had been on the road for a long time and suggested, not unreasonably, that they were trying to reach their destination as quickly as possible. Indeed, many of the items Trooper Miller observed inside the truck here are virtually identical to those in *Bowman*: an energy drink, a bottle of water, some miscellaneous items of fast food or snacks, trash, and a plastic bag with clothes in it. And Trooper Miller's explanation why these items were suspicious mirrors, in large part, the officer's suspicions in *Bowman*—that Contreras and Alvarado may have been trying to stay awake while traveling long distances without stopping. Contreras and Alvarado also both appeared fatigued, like they had been on the road for a

---

[21] Even if the court were persuaded that Trooper Miller believed this was a "turnaround trip," that belief is not supported by the facts known to him at the time. In *United States v. Foreman*, the evidence was that the driver drove approximately 7 hours to New York City, was there only a few hours, and then returned. 369 F.3d 776 at 784–85 (4th Cir. 2004). Moreover, in *Foreman*, there were several air fresheners hanging from the rear-view mirror and Foreman's nervousness increased as the stop progressed. *Id.* at 785. And in *Mason*, the driver had only a single key on his keyring and a newspaper from a hotel in a known "source" city. 628 F.3d at 139. This is not what Trooper Miller encountered. *See United States v. Foster*, 634 F.3d 243, 249 (4th Cir. 2011) (noting that "the Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband").

while. But as the court noted in *Bowman*, all of this is no more suggestive of drug-trafficking than it is of innocent travel. Indeed, traveling long distances with few breaks and little sleep is indicative of a substantial portion of the motoring public, particularly younger drivers.

The absence of a suitcase here does not substantively alter the comparison with *Bowman* because Trooper Miller observed clothing in the truck. The bag stuffed with these items was large, and it was full. (*See* Govt.'s Hr'g Ex. 3.) Although it may have appeared odd to Trooper Miller for someone to travel without formal luggage, this was not the more suspicious scenario, existing in *Mason*, of someone traveling long distances without *any* clothes or personal belongings. As in *Bowman*, these factors are "utterly unremarkable" and "entirely consistent with innocent travel" such that they do not alone give rise to reasonable suspicion. *Bowman*, 884 F.3d at 216 (citing *United States v. Beck*, 140 F.3d 1129, 1138 (8th Cir. 1998)).

### iii. Inconsistent and Suspicious Travel Stories

In *Bowman*, the officer also found it suspicious that Bowman could not recall exactly where he had come from, and that he and his passenger's stories about where they had been were inconsistent. *Id.* at 207, 216. Bowman recalled that he had picked up his passenger at his girlfriend's house in North Carolina approximately 25–30 minutes prior, but could not recall where she lived, instead insisting that the information was stored on his GPS. *Id.* at 206–07. The passenger, on the other hand, told the officer that they had been visiting friends in Georgia. *Id.* at 207.

Here, Alvarado and Contreras provided different answers about where they had been. Alvarado initially told Trooper Miller that they had been to "a few places," including Nashville. When asked, Contreras told Trooper Miller that they had visited Austin, Texas. And when

Trooper Miller asked her about this apparent discrepancy, Alvarado responded that they had indeed visited Texas, but specified Houston.

Alvarado was no doubt less than clear about her travel itinerary, and Austin and Houston are inconsistent. But she never told the officer that Nashville was the *only* place that they had been. She initially stated that the couple had visited a few places, naming only one—Nashville. Trooper Miller had initially gotten from her a hesitant and, as the government correctly describes it, "vague, confused" answer. (Gov.'s Post-Hr'g Br. at 10.) Alvarado even stated on additional questioning that she did not think it was important to provide the officer with a detailed accounting of their road trip.

Notably, Alvarado's explanation of where she was going never changed. She said they were traveling to Aberdeen, Maryland, and when Trooper Miller asked again, Alvarado then elaborated that she was not presently residing in Aberdeen, but rather living temporarily in nearby Baltimore while she attended the University of Maryland. She never changed her initial answer that the couple was traveling to Aberdeen, which belies the government's suggestion that she did not know or was untruthful about where she was going. But more importantly, Trooper Miller did not explain how any of this was, on its own, indicative of drug trafficking as opposed to innocent, if oblivious, behavior. *See Williams*, 808 F.3d at 246. As in *Bowman*, these apparent inconsistencies do not give rise to reasonable suspicion. *See* 884 F.3d at 207.

Arguing otherwise, the government cites to *United States v. Vaughan*, 700 F.3d 705, 712 (4th Cir. 2012), but that case is readily distinguishable. There, the driver and passenger provided wildly inconsistent accounts of where they had been; the driver indicated that he had just driven to a nearby town to pick up his passenger, while the passenger informed the officer

that they were returning from an overnight trip to a neighboring state. *Id.* at 707. And unlike here, there were other substantial factors supporting reasonable suspicion in *Vaughan*.[22] First, the officer testified that the passenger's nervousness increased as the stop progressed. *Id.* at 705, 711. Second, the trooper observed "four cellular phones in the center console of Vaughan's vehicle, at least two of which were pre-paid phones known as TracFones." *Id.* The trooper testified that "these phones are typical . . . with people involved with drugs" because "no identification information need be provided to obtain them." *Id.* There are no similar indicia of drug-trafficking activity in this case. Considering all these factors, the court is persuaded that the instant case is more *Bowman* than *Vaughan* or *Mason*.[23]

### 3.   Other Factors Are Not Persuasive

The court is left with three additional factors, none of which give rise to reasonable suspicion: (i) the high mileage on the odometer accumulated in a short period of time, (ii) Trooper Miller's supposition that Houston is a source city for narcotics activity, and (iii) the "Thin Blue Line" decal on the truck's rear windshield.

---

[22] To be sure, there are degrees of inconsistencies. Here, the primary inconsistency was which city in Texas the couple had visited. In *Vaughan*, the travelers conflicted on which *state* their trip had originated from.

[23] The current state of the law in the Fourth Circuit seems to be that at least one substantial "plus-factor" must be present—in addition to what appear to be the traditional reasonable suspicion justifications: nervousness, various iterations of messy vehicle interiors indicative of long travel with few stops, and inconsistent travel plans among occupants—in order for law enforcement to arrive at reasonable suspicion. In this regard, the Fourth Circuit has recently relied heavily on *Bowman* as one of its foundational precedents. *See, e.g.*, *United States v. Miller*, No. 21-4086, 2022 WL 17259018, at *5–6 (4th Cir. Nov. 29, 2022) (containing a rule statement relying more heavily on *Bowman* than any other precedent).

The court is not reducing the reasonable suspicion totality-of-the-circumstances analysis to a mechanical formula, but rather is recognizing the clear pattern that emerges when this Circuit's precedents are synthesized and its most recent opinions heeded.

i.     <u>High Mileage on Newer-Model Truck</u>

First, Trooper Miller testified that he observed the odometer's high mileage reading (over 44,000 miles) on the new-model truck. (Hr'g Tr. 12:2–10.) During his MDT database checks, Trooper Miller learned that the truck had been registered in July 2020 with approximately 43 miles on it. (*Id.* 20:2–13.) Since the truck's odometer displayed over 44,000 miles, this meant that the truck had been driven about 44,000 miles in less than a year-and-a-half. (Hr'g Tr. 20:25–21:4.) Trooper Miller testified that the high mileage caused him to be suspicious of drug trafficking, especially when considered with everything else. (*Id.* 27:8–14.) In his view, it was "not normal for the average citizen" to have driven that "astronomical amount of miles." (Hr'g Tr. 51:22–52:3.)

As with the vacuum-sealer packaging material, Trooper Miller did not check the available "high mileage" box on his Contact Report Form B under the "Indicators" section. (Contact Report Form B.) Nor did he confront Contreras or Alvarado about it. It is also completely absent from his ROI narrative (ROI; Hr'g Tr. 49:10–12), and he made no mention of it to his fellow troopers (*see generally* Video). Like the vacuum-sealer packaging material, the court would expect this factor to have been reported on at the scene or show up *somewhere* in Trooper Miller's police reports. As with the vacuum-sealer packaging material, the court finds that Trooper Miller was mistaken about when he discovered the high mileage on the odometer, determines that it was not discovered until during or after the consent search, and therefore gives this factor no weight on its own.

ii.    Road Trip to Houston

Trooper Miller also testified that Houston is a "source location" for narcotics and criminal activity, without providing a specific basis for that belief. (Hr'g Tr. 30:16–20.) Whatever the basis of Trooper Miller's belief—presumably his training and experience—the court simply cannot accept this statement at face value. Today, most major metropolitan areas of the United States are source cities for illegal drugs. Houston is no more deserving of this appellation than any other large city, and interstate travel from Houston or Austin is no more indicative of drug trafficking than travel from Los Angeles, New York, Miami, Atlanta, Chicago, Denver, or Detroit. The court, in sum, finds the "'source city' discussion fully unconvincing." *Foreman*, 369 F.3d at 794 (Gregory, J., concurring in part) (collecting cases). Were the court to endorse the government's proposition, it would open the door to police claiming that virtually *any* location was a "source location" for drugs.

iii.    "Thin Blue Line" Decal

Finally, the government argues that the presence of a pro-police decal on the truck's back window was suspicious. Although Trooper Miller testified that drug traffickers also use military stickers or religious memorabilia as "disclaimers," the court is not convinced. If the truck had a "Legalize It" sticker, would that have been an indicator as well? Just as with the eye-contact-as-nervousness indicator, the government cannot have a factor cut in its favor any way it is sliced. The court gives the presence of the decal no weight on its own. It is "entirely consistent with innocent travel" such that it does not give rise to reasonable suspicion. *Bowman*, 884 F.3d at 216.

## D. Totality of the Circumstances

Finding that none of the factors presented alone provided a reasonable basis for Trooper Miller's suspicion that criminal activity was afoot, the court "must still consider all the factors together, given that 'reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation.'" *Bowman*, 884 F.3d at 218 (citing *McCoy*, 513 F.3d at 413–14). Although each articulated fact need not "on its own eliminate every innocent traveler," *McCoy*, 513 F.3d at 413, "the facts, in their totality, should eliminate a substantial portion of innocent travelers." *Williams*, 808 F.3d at 251 (cleaned up). The government urges that, although one or two of the factors presented would probably not amount to reasonable suspicion (Hr'g Tr. 80:8–11), the totality of the circumstances amount to reasonable suspicion. The government analogizes the legal standard to take each of the factors together as "sort of a Venn diagram," with "all of these different things that come together in the middle to create a reasonable and articulable suspicion," especially when viewing them through the prism of Trooper Miller's 15 years of drug interdiction experience. (Hr'g Tr. 80:4–8; Gov.'s Post-Hr'g Br. at 7.)

But the factors here, when considered in their totality and under this Circuit's recent precedents, do not objectively amount to reasonable suspicion of criminal activity—even when accounting for Trooper Miller's considerable experience. Analyzing the articulated factors collectively, the court concludes that reasonable suspicion is lacking because the facts the court finds were weighing in Trooper Miller's mind *at the time* did not 'in their totality serve to eliminate a substantial portion of innocent travelers.'" *Williams*, 808 F.3d at 246 (citing *McCoy,* 513 F.3d at 413) (emphasis added).

In making this determination, *Bowman*'s precedential value cannot be ignored. This is especially so since the court makes the threshold factual finding that Trooper Miller did not observe or consider the vacuum-sealer packaging material or high odometer mileage reading until *after* he extended the stop. After stripping away the vacuum-sealer packaging material and high odometer reading, this case falls squarely within the rule espoused in *Bowman*.

Trooper Miller is an accomplished police officer with 19 years of total law-enforcement experience, 15 years of drug interdiction assignments, and tens of thousands of vehicle stops. Contreras rightly concedes that this trooper's hunch is well tuned. (Hr'g Tr. 70:10–13.) And Trooper Miller was inarguably correct; someone in that truck *was* trafficking a large quantity of cocaine. But without more, a hunch—however well-tuned and correct it may ultimately turn out to be—is not sufficient under the Fourth Amendment to prolong a vehicle stop to investigate criminal activity. *Wardlow*, 528 U.S. at 123 (quoting *Terry*, 392 U.S. at 27). Under binding Fourth Circuit precedent, which this court is obligated to apply, Trooper Miller did not have reasonable suspicion that drug trafficking was afoot when he abandoned his traffic stop for a narcotics investigation.

## E. Suppression of Evidence Unlawfully Seized

The exclusionary rule "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 232 (2011). Under the exclusionary rule, the law requires the court to suppress and deem inadmissible the fruits of a search that violated the Fourth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 654–55 (1961) (holding that the Fourth Amendment and exclusionary rule are applicable to the states through the Fourteenth Amendment); *United States v. Doyle*, 650 F.3d 460, 466–67 (4th Cir. 2011). The

exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348 (1974). The burden of showing a reasonable expectation of privacy in the area searched rests with the defendant. *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007).

The government correctly concedes that Contreras, as a co-owner/registrant, "has standing to the truck." (Hr'g Tr. 83:24–25); *Rakas v. Illinois*, 439 U.S. 128, 130 (1978).[24] Because the narcotics evidence was obtained by way of a Fourth Amendment violation, it will be suppressed and deemed inadmissible in this case.

## IV.   CONCLUSION

For the reasons explained above, Defendant Michael Luis Contreras's motion to suppress will be granted.

The clerk is directed to forward a copy of this Order to all counsel of record.

**ENTERED** this 23rd day of December, 2022.

/s/ *Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[24] "[T]he Supreme Court has moved away from an independent doctrine of 'Fourth Amendment standing.' In *Rakas v. Illinois*, the Court observed that 'the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.' The relevant inquiry, thus focused, is 'whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect.'" *United States v. Castellanos*, 716 F.3d 828, 832 n.3 (4th Cir. 2013) (quoting *Rakas* 439 U.S. at 139–40).